## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| KEITH HARTLEY, *on behalf of himself and all others similarly situated*, | Civil No. 11-2664 (JRT/JJG) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| SUBURBAN RADIOLOGIC CONSULTANTS, LTD. and CT INC., *as assumed name for Colltech, Inc.*, | |
| Defendants. | |

Mark L. Vavreck, **MARTINEAU, GONKO & VAVRECK, PLLC**, 401 North Third Street, Suite 600, Minneapolis, MN 55401; and Thomas J. Lyons, Jr., **CONSUMER JUSTICE CENTER P.A.**, 367 Commerce Court, Vadnais Heights, MN  55127, for plaintiff.

Matthew R. Doherty, **BRUTLAG, HARTMANN & TRUCKE, PA**, 3555 Plymouth Boulevard, Suite 117, Plymouth, MN  55447, for defendants.

This case arises out of a $13.92 payment that Hartley allegedly owed to Suburban Radiologic Consultants, Ltd. ("Suburban"), a physician-owned radiology practice in the Twin Cities.  Suburban retained CT Inc. Services[1] ("Colltech") to provide debt collection services on Suburban's overdue accounts.   In an attempt to collect Hartley's overdue account, Colltech sent Hartley at least one collection letter.  Hartley brings the current action, alleging multiple violations of the Fair Debt Collection Practices Act ("FDCPA"),

---

[1] CT Inc. Services is an assumed name for the entity Colltech, Inc.

15 U.S.C. §§ 1692 *et seq.*, against Suburban and Colltech (collectively, "Defendants") based on the contents of the letter.  Specifically, Hartley claims that (1) the letter constitutes a flat-rating scheme in violation of 15 U.S.C. § 1692j, which prohibits a creditor from creating the false impression that a debt collector is involved in the collection of a creditor's debts, when in fact a third party is merely furnishing collection letters which create that false impression; (2) the letter failed to provide notices required by the FDCPA informing Hartley of his right to contest the validity of the debt; and (3) the letter falsely informed Hartley that failure to pay the balance due on his account could result in damage to his credit score.  Hartley's complaint also includes class allegations with respect to his first claim.

The parties bring cross motions for summary judgment on Hartley's flat-rating claim.  The Court will deny Defendants' motion because they have not established that they are entitled to judgment as a matter of law.  The Court will deny Hartley's motion as premature, because Hartley cannot, at this stage, obtain a binding judgment on class members that have not yet received notice of the action and an opportunity to opt out. Defendants also move for summary judgment with respect to Hartley's remaining individual claims.  Because no material issues of fact remain regarding whether Defendants sent Hartley the mandated notices under the FDCPA, the Court will grant Defendants' motion with respect to that claim.  The Court will also grant Defendants' motion with respect to Hartley's credit reporting allegation, because the letter's warnings about possible damage to Hartley's credit score were not false or misleading as a matter of law.  Finally, Hartley moves for class certification with respect to the flat-rating claim

under Federal Rule of Civil Procedure 23(b)(3).  The Court will grant the motion because common questions of law or fact predominate and a class action is the superior method for fairly and efficiently adjudicating the controversy.

## BACKGROUND

### I.   THE COLLECTION AGREEMENT

Colltech is a debt-collection company with its principle place of business in Plymouth, Minnesota.  (Aff. of Ray Costello ¶ 2, Dec. 17, 2012, Docket No. 41.) Suburban is a physician-owned radiology practice with multiple locations throughout Minneapolis and Saint Paul.  (*Id.* ¶ 3.)

On November 30, 2006, Suburban and Colltech entered into a Collection Agreement.  (*Id.* ¶ 3, Ex. A.)  The Collection Agreement appoints Colltech as Suburban's agent "to collect and receive for [Suburban] all sums of money due or payable to [Suburban] for claims which [Suburban] lists with [Colltech]."  (*Id.*, Ex. A ¶ 1.)  The Collection Agreement also provides Colltech with the authority to receive payments from debtors, after which Colltech is directed to "remit all monies due [Suburban] by the 10th of each calendar month for collections made during the previous month."  (*Id.*, Ex. A ¶ 3.)  Suburban is required to notify Colltech of any payments received by Suburban within seven days of receipt.  (*Id.*, Ex. A ¶ 4.)

With respect to methods of debt collection, the Collection Agreement provides that Colltech "shall use only ordinary and reasonable collection efforts permitted by local, State, and Federal laws including the Fair Debt Collections Practices Act," but

otherwise does not specify the mechanisms for Colltech's debt collection.  (*Id.*, Ex. A ¶ 2.)  The Collection Agreement indicates that "any negotiations carried on between [Colltech] and Debtors will be at [Colltech]'s discretion, and that [Suburban] will in no way hamper, interfere or attempt to alter arrangements made by [Colltech] as long as the negotiations are within the law."  (*Id.*, Ex. A ¶ 5.)  Colltech is not, however, authorized to "accept any compromise settlement without prior consent from Suburban."  (*Id.*)

## II.   COLLTECH'S COLLECTION PROCESS

Colltech engages in two phases of collection activity on behalf of Suburban. (Costello Aff. ¶ 3.)  Phase 1 involves a three-series letter writing campaign.  (Aff. of Mary Fredin ¶ 2, Dec. 17, 2012, Docket No. 40.)  Phase 2 includes traditional debt collections methods such as additional letter writing and telephone calls.  (*Id.* ¶ 4.)

### A.   Phase 1 Letter Creation and Mailing

Phase 1's series of three letters is triggered when a Suburban client's account is between 120 and 150 days past due.  (Second Decl. of Mark L. Vavreck, Ex. 5, (Dep. of Mary Fredin ("Fredin Dep.") 8:22-25, 9:4-14), Jan. 7, 2013, Docket No. 47; Fredin Aff. ¶ 2.)  The purpose of Phase 1 is "[t]o try and get the patient to contact [Suburban] to pay their outstanding bill."  (Fredin Dep. 9:6-9.)  Suburban's goal in Phase 1 is to encourage "account holders or the debtors" receiving the letters to "call and respond directly to Suburban." (*Id.* 13:12-15.)

Suburban does not draft or create the letters used by Colltech in Phase 1, but Colltech sends copies of the draft letters to Suburban for Suburban's review and

approval.  (*Id.* 16:22-17:14; Second Decl. of Thomas J. Lyons Jr., Ex. 3 (Dep. of Ray Costello ("Costello Dep.") 12:7-20), Dec. 14, 2012, Docket No. 31.)

When Suburban first refers an account to Phase 1, it creates a credit letter for every overdue account.  (Fredin Dep. 23:14-23.)  These letters are identical to the letters that Suburban would have sent out to debtors when Suburban was conducting its own Phase 1 collection activities.[2]  (*Id.* 24:16-22.)  Suburban sends Colltech a Note Pad file containing batches of credit letters for those accounts Suburban is referring to Phase 1.  (Costello Dep. 23:8-20.)  Suburban typically sends 600 to 700 accounts to Colltech per week.  (Fredin Dep. 26:3-8.)  Upon receiving the batch of letters, a Colltech program extracts the name, address, account number, and balance due for each debtor from Suburban's Note Pad file of letters, and then populates a letter drafted by Colltech with the information obtained from Suburban's files.  (*Id.* 29:2-7, 69:2-13; Costello Dep. 24:3-25:1.)

Colltech sends the completed letters electronically to a third-party, Apex Print Technologies, LLC ("Apex"), for printing and mailing.  (Costello Dep. 25:5-26:25; Aff. of Warren Becker ¶ 3, Dec. 17, 2012, Docket No. 42.)  Apex prints the letters on preprinted letterhead bearing the insignia "CT Inc. Services."  (Costello Dep. 26-27.)  Apex mails the letters to the identified account holder and sends an email confirmation to

---

[2] Prior to contracting with Colltech, Suburban conducted its own Phase 1 collection, sending out past due notices on its own letterhead.  (Fredin Dep. 18:21-19:2.)  Suburban switched to running Phase 1 through Colltech in part because the Suburban letters were not generating the response Suburban desired and because it was more cost effective for Suburban to have a different entity print and mail the letters.  (*Id.* 19:3-13.)

Colltech acknowledging receipt of the file and representing that the total number of documents within the file were mailed.  (Becker Aff. ¶ 7.)

Colltech provides Suburban with acknowledgements that the first letter has been sent on the Phase 1 accounts.  (Fredin Dep. 32:3-11.)  After thirty days, Suburban returns this report to Colltech with a list of accounts that have been paid, directing Colltech not to send a second letter on those accounts.  (*Id.* 33:19-24.)  If an account is paid after the second letter is sent, Suburban emails Colltech, alerting it that a third letter should not be sent.  (*Id.* 35:17-22.)  The entire series of letters is typically sent within forty-five days of Suburban's referral of the account.  (*Id.* 9:12-16; Costello Dep. 29:17-23.)  After a third letter is sent, Colltech closes the debtor's account.  (Fredin Dep. 36:6-9.)  The account automatically reverts to Suburban who reviews the account to determine whether to send it to Phase 2 collection.  (*Id.* 22:14-20, 36:14-17; Costello Dep. 21:1-12.)

## B.     Defendants' Roles During Phase 1

During Phase 1, if a letter is returned because of an incorrect or insufficient address, Colltech returns the account to Suburban, and makes no effort to locate a correct address.  (Costello Dep. 35:19-36:1.)  Suburban does not provide Colltech with the social security numbers or dates of birth of the debtors linked to its Phase 1 accounts.  (Fredin Dep. 29:8-15.)

During the course of Phase 1, Suburban handles debtors' calls and written communications and collects payment on the overdue accounts.  (*Id.* 41.)  Colltech refers all debtor communications to Suburban.  (*Id.* 72:9-11.)  Suburban also handles debtors'

disputes regarding the allegedly overdue accounts. (*Id.* 42:1-4.) A Suburban representative indicated that Colltech does receive payments from some debtors through the mail, but did not know what percentage of payments was received by Colltech rather than Suburban. (*Id.* 69:25-70:11.) During collection Suburban always maintains and owns the debtors' accounts. (*Id.* 10:22-24.) Suburban pays Colltech a flat fee of $3.75 per account during Phase 1. (*Id.* 12:18-20, 13:3-4.) If an account is collected during Phase 1, Suburban does not pay Colltech any portion of the recovery. (*Id.* 12:23-13:2.)

### C.     Phase 2

If a debtor does not respond to the final Phase 1 letter within thirty days, Suburban places the account into Phase 2. (*Id.* 36:18-22.) Suburban uses Colltech as well as another collection agency to implement Phase 2. (*Id.* 10:1-8.) A Colltech Phase 1 account therefore is not necessarily referred to Colltech for Phase 2 collection. (*Id.* 36:24-37:5.)

Suburban transfers information to the collection agency for Phase 2 collection including the debtor's name, address, account number, balance due, social security number, employment telephone number, location of the service for which the debt was incurred, and date of birth. (*Id.* 37:21-38:21.) Suburban pays the retained collection agency a 25% commission on accounts paid during Phase 2 efforts. (*Id.* 13:5-9.)

### D.     Credit Reporting

Suburban does not report to credit reporting agencies. (*Id.* 11:18-21.) Colltech does not report to a credit reporting agency on Suburban accounts when the account is in

Phase 1.  (Costello Dep. 15:22-16:2, 18:20-24.)  Suburban understood that no credit reporting was done during Phase 1.  (Fredin Dep. 39:3-9.)  In Phase 2 Colltech reports accounts with outstanding amounts over $10 to credit reporting agencies.  (*Id.* 43:7-9; Costello Dep. 18:2-7.)

### III.    COLLECTION OF HARTLEY'S ACCOUNT

One of Suburban's overdue accounts included Hartley's debt in the amount of $13.92.  (Fredin Aff. ¶ 6.)  Suburban referred this account to Colltech for Phase 1 collection.  (*Id.*)

#### A.    Third Phase 1 Letter

Hartley alleges that he received only a single letter from Colltech, dated February 15, 2011 ("Letter 3").  (Aff. of Keith Hartley ¶¶ 3-4, Jan. 7, 2013, Docket No. 46.)  The letter Hartley admits receiving is the third letter in the Phase 1 series. (Costello Aff. ¶ 5.)  As the third letter in the series, Letter 3 does not contain certain statutorily mandated notices that Colltech allegedly provided in the first letter of Phase 1. (*See* Costello Aff., Ex. C.)

Letter 3 bears Colltech's letterhead and provides a P.O. Box address for Colltech adjacent to the letterhead.  (Second Vavreck Decl., Ex. 1.)  Letter 3 also lists Suburban's address and includes the phone number for Suburban's customer service department. (*Id.*; Fredin Dep. 40:10-13.)

With respect to Hartley's payment obligation, Letter 3 states the balance due of "$13.92" as well as Hartley's account number.  (Second Vavreck Decl., Ex. 1.)  The

Letter states: "Respond to this obligation without further delay.  The alternatives available to our client should you not clear this obligation may include damage to your credit rating or further collection activity." (*Id.*)  The only directions for making payment provided by Letter 3 is an instruction "[t]o pay on-line go to: www.subrad.com, click on 'pay my bill' in the lower right corner, and enter the account number listed above." (*Id.*)

Letter 3 is signed by Jim Miller "Collections Manager," and states in all caps "This is an attempt to collect a bill.  Any information obtained will be used for that purpose.  This communication is from a debt collector.  This collection agency is licensed by the Minnesota Dept of Commerce." (*Id.*)

### B.      First and Second Phase 1 Letters

The parties dispute whether Colltech ever sent Hartley the first two letters in the Phase 1 series.  This dispute is relevant to Hartley's claim that Defendants violated the FDCPA by failing to provide him with mandated notices.  The first letter in the Phase 1 series ("Letter 1") contains the mandated notices that Letter 3 lacks.  (*See* Costello Aff., Ex. C.)  Specifically, Letter 1 alerts the debtor that "[u]nless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid.  If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt . . . ." (*Id.*)

Colltech submitted a screen shot of Hartley's account indicating that actions were taken on his account on December 29, 2010, February 2, 2011, and February 15, 2011.

(Costello Aff. ¶ 5, Ex. B.)  The account information indicates that a different form letter was generated by Colltech on each of the above dates and transmitted to Apex.  (*Id.* ¶ 5, Ex. B.)  Costello, the CEO and owner of Colltech, avers that Letter 1 was generated by Colltech on December 29, 2010, and was sent to Apex for printing on the same day.  (*Id.* ¶¶ 1, 5.)  The copy of Letter 1 attached to Costello's affidavit is addressed to Hartley and contains information about Hartley's account.  (*Id.*, Ex. C.)  The letter bears a printed date of September 20, 2011, and a handwritten date of December 29, 2010.  (*Id.*)  Costello explained that September 20, 2011, was the date that the attached copy of the letter was actually printed – shortly after Defendants received notice of Hartley's lawsuit. (*Id.* ¶ 5.)

Warren Becker, the CFO of Apex, submitted an affidavit indicating that Letter 1 was received from Colltech on December 29, 2010, at 6:08 p.m.  (Becker Aff. ¶ 8.) Letter 1 was addressed to Hartley, printed, inserted into an envelope, and delivered for mailing on December 30, 2010, at 9:00 a.m.  (*Id.*)  Pursuant to Apex's regular business practices, Letter 1 would then have been delivered to its presort house for input into the United States Postal Service mail stream.  (*Id.* ¶ 5.)  Each step in Apex's print and mail process is documented electronically, and a confirmation email would have been sent to Colltech containing validation that each document sent to Apex was mailed.  (*Id.* ¶¶ 6-7.) Becker's affidavit contains no information about the mailing of the second letter in Phase 1 ("Letter 2").

The language and content of Letters 1 and 2 are substantially similar to that of Letter 3.  (Costello Dep., Ex. 15; Costello Aff., Ex. C; Second Vavreck Decl., Ex. 1.)

The letters are printed on Colltech's letterhead but contain Suburban's address and customer service telephone.  (Costello Dep., Ex. 15; Costello Aff., Ex. C; Becker Aff. ¶ 5.)  The letters also direct payment to be mailed to Suburban Radiologic at the address listed or submitted online through www.subrad.com.  (Costello Dep., Ex. 15; Costello Aff., Ex. C.)

On September 14, 2011, Hartley filed a complaint alleging violations of the FDCPA against Suburban and Colltech.  (Compl., Sept. 14, 2011, Docket No. 1.)  First, the complaint alleges that Letter 3 was misleading because the telephone number listed on the letter was controlled by Suburban, not Colltech, in violation of 15 U.S.C. §§ 1692j, 1692e, 1692e(10), 1692e(14) and 1692f(8).  (Compl. ¶ 12.)  Second, the complaint alleges that Defendants violated 15 U.S.C. § 1692g(a) because Letter 3 failed to provide Hartley with mandated notices, including but not limited to, alerting Hartley of the dispute and validation process.  (Compl. ¶ 10.)  Finally, the complaint alleges that Letter 3 contained false or misleading information in violation of 15 U.S.C. § 1692e(8), by stating that "damage to your credit rating" may happen.  (Compl. ¶ 11.)  The complaint alleges that this statement is false because Suburban does not report overdue accounts to credit reporting agencies.  (*Id.*)  The complaint also states generally that "[t]he foregoing acts and omissions of Defendants constitute numerous and multiple violations of the FDCPA, including but not limited to each and every one of the above-cited provisions of the FDCPA."  (*Id.* ¶ 22.)

Hartley's complaint seeks $1,000 in statutory damages pursuant to 15 U.S.C. § 1692k(a)(2)(A) as well as reasonable attorneys' fees and costs pursuant to 15 U.S.C.

§ 1692k(a)(3).  (Compl. ¶ 23.)  The complaint also contains class allegations, on behalf of the class of "all consumers in the state of Minnesota to whom letters were sent identical or similar to [Letter 3], within one (1) year from the date of the filing of this action."  (*Id.* ¶ 13.)  The complaint identifies the principle common question of law as "whether the Defendants violated the FDCPA by its misleading and false collection communication." (*Id.* ¶ 15.)

## ANALYSIS

## I.  MOTIONS FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[3]

---

[3] Defendants make several arguments in their brief that seem to suggest they are bringing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  For example, Defendants cite *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), arguing that Hartley "must plead sufficient facts to establish a plausible claim for relief."  (Defs.'

(Footnote continued on next page.)

The FDCPA is a remedial, strict liability statute "and is liberally construed to protect consumers." *Zortman v. J.C. Christensen & Assocs., Inc.*, 870 F. Supp. 2d 694, 702 (D. Minn. 2012) (citing *Picht v. John R. Hawks, Ltd.*, 236 F.3d 446, 451 (8th Cir. 2001)). "A violation of the FDCPA is reviewed utilizing the unsophisticated-consumer standard which is designed to protect consumers of below average sophistication or intelligence without having the standard tied to the very last rung on the sophistication ladder." *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) (internal quotation marks omitted). This standard is meant to "protect[] the uninformed or naive consumer," while still "contain[ing] an objective element of reasonableness to protect debt collectors from liability for peculiar interpretations of collection letters." *Id.* at 317-18.

### B.   Propriety of Deciding the Motions for Summary Judgment

As an initial matter, the Court must determine whether it is appropriate to consider at this time the parties' motions for summary judgment that were filed simultaneously

_____

(Footnote continued.)

Mem. in Supp. of Summ. J. at 11, Dec. 17, 2012, Docket No. 39.) Defendants also describe the standard of review for a motion to dismiss, explaining that "[t]aking all of the facts in Plaintiff's Complaint to be true, and construing all reasonable inferences from those facts in the light most favorable to the Plaintiff, the Court must conclude that Plaintiff cannot demonstrate that Defendant's alleged threat to report the debt to a consumer reporting agency was false and misleading." (*Id.* at 14.) Because discovery has been conducted, Defendants have relied on that discovery in arguing for judgment on Hartley's claims, and other than the stray references, Defendants' motion is not styled as a motion to dismiss, the Court treats the present motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d) (explaining that a motion under 12(b)(6) must be treated as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court").

with Hartley's motion for class certification. *See Friedman v. May Dep't Stores Co.*, 990 F. Supp. 571, 573-74 (N.D. Ill. 1998) (considering as a preliminary issue whether it was appropriate to rule on defendant's motion for summary judgment prior to resolving the question of class certification).

Federal Rule of Civil Procedure 23 provides that a district court must rule on the issue of class certification "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1). Consequently, "[a]s a general rule, courts decide class certification motions before addressing dispositive motions." *Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.D.C. 1997); *see also Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995). Courts apply this general rule because "a plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified." *Standard Fire Ins. Co. v. Knowles*, ___ U.S. ___, 133 S. Ct. 1345, 1349 (2013). Accordingly, any ruling on the merits of a proposed class action that precedes class certification – whether in defendants' or plaintiffs' favor – has no binding effect on any unnamed class member. *Smith v. Bayer Corp.*, ___ U.S. ___, 131 S. Ct. 2368, 2379-80 (2011) (explaining that "[n]either a proposed class action nor a rejected class action may bind nonparties" and "a nonnamed class member is [not] a party to the class-action litigation **before the class is certified**" (emphasis in original) (internal quotation marks omitted)).

Courts have recognized that defendants may have a right to waive the protections of this general rule and seek a ruling on the merits of putative class claims prior to class certification. *See, e.g., Curtin v. United Airlines, Inc.*, 275 F.3d 88, 92 (D.C. Cir. 2001)

- 14 -

(affirming the district court's grant of summary judgment in favor of defendants rendered prior to ruling on plaintiffs' motion for class certification); *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1343 (11th Cir. 2000) ("It was within the court's discretion to consider the merits of the claims before their amenability to class certification."). By choosing to file a motion for summary judgment prior to the determination of class certification issues, defendants waive their right to obtain a ruling that will be binding upon the class. *Schwarzschild*, 69 F.3d at 297. Courts have recognized that it is a defendant's prerogative to seek a ruling on the merits that will bind only the named plaintiff, explaining that defendants "lose[] the preclusive effect on subsequent suits against [them] of class certification but save[] the added expense of defending a class action and may be content to oppose the members of the class one by one . . . by moving for summary judgment, every time [they are] sued, before the judge presiding over the suit decides whether to certify it as a class action." *Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941-42 (7th Cir. 1995).

Recognizing a defendant's right to waive the protections of a decision binding upon class members, courts have considered a defendant's dispositive motion prior to resolving class certification issues where such consideration will not prejudice the parties and "an initial ruling on the merits of a claim would protect the parties from needless and costly further litigation." *In re Starbucks Emp. Gratuity Litig.*, 264 F.R.D. 67, 75 (S.D.N.Y. 2009). Deciding dispositive motions first can avoid costly litigation associated with class certification because "if the court determines that the named plaintiffs' claims lack merit, such a decision ordinarily, though not invariably, disqualifies the named

plaintiffs as proper class representatives, thus resolving the issue of class certification." *Chavez v. Ill. State Police*, 251 F.3d 612, 630 (7th Cir. 2001) (alteration and internal quotation marks omitted); *see also Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir. 1984) ("To require notice to be sent to all potential plaintiffs in a class action when the underlying claim is without merit is to promote inefficiency for its own sake.").

Consideration of Defendants' motion for summary judgment in this case has the potential to dispose of Hartley's claims or narrow the issues subject to class certification. Therefore resolution of Defendants' motion could protect all parties from additional costs associated with class certification. Furthermore, the Court finds no reason that Hartley will be prejudiced by consideration of Defendants' motion. Therefore, the Court will exercise its discretion to consider Defendants' motion at this juncture. The Court notes, however, that any decision regarding Defendants' motion will be binding only upon Hartley, the named plaintiff, and will not be binding upon any potential class members that have not received notice and an opportunity to opt out of the litigation. *See Reynolds v. Barrett*, 741 F. Supp. 2d 416, 424-25 (W.D.N.Y. 2010).

The Court will not, however, address Hartley's motion for summary judgment at this stage. Although courts have recognized a defendant's waiver of the right to secure a judgment that will be binding upon a putative class by seeking resolution of the representative plaintiff's claims on the merits prior to a determination on class certification issues, courts have been reluctant to allow the same waiver by plaintiffs. *See Weir v. Joly*, No. CV-10-898, 2011 WL 6043024, at *1-2 (D. Or. Dec. 2, 2011). Instead, where plaintiffs seek a ruling on the merits of their claims prior to class certification,

courts have adhered to the general rule that courts postpone determination of the merits until after class members have been given notice in order to "avoid the problem of 'one-way intervention' – whereby a potential class member could await the outcome of a determination on the merits before deciding whether to join the class." *Gomez v. Rossi Concrete Inc.*, No. 08cv1442, 2011 WL 666888, at *1 (S.D. Cal. Feb. 17, 2011); *see also Hyman*, 982 F. Supp. at 11 ("One of the recognized problems that arises when dispositive motions are addressed before class certification motions is that of one-way intervention. By allowing putative class members to wait while the merits of a claim are decided, these members are given the ability to watch the proceedings without any risk to their individual claims which would be precluded by an adverse ruling on the merits."). *But see Kinder v. Dearborn Fed. Sav. Bank*, No. 10-12570, 2011 WL 6371184, at *2-3 (E.D. Mich. Dec. 20, 2011) (granting plaintiff's motions for summary judgment on liability and class certification simultaneously). Although the problem of one-way intervention is potentially implicated when a defendant moves for summary judgment prior to class certification, the problem is more prevalent when the court rules on a plaintiff's motion for summary judgment. For example, if a court grants a plaintiff's motion for summary judgment, potential class members will know that they have a guaranteed victory if they join in the class. On the other hand, if the court denies a defendant's motion for summary judgment prior to class certification, no final determination has been made of the merits of the case, and putative class members know only that they have a chance of prevailing at trial. Additionally, if the court grants a defendant's motion for summary judgment

prior to class certification, no class is ever certified, and therefore the risk of one-way intervention does not exist.

Hartley's current motion for summary judgment raises the problem of one-way intervention identified by other courts – in that putative class members will be able to opt in or out of the proceedings based on Hartley's success or lack thereof on his motion for summary judgment – the Court will decline to consider Hartley's motion at this time, and will deny the motion without prejudice. *See Weir*, 2011 WL 6043024 at *2 (postponing ruling on plaintiff's motion for summary judgment prior to determining class certification issues, but determining that consideration of defendant's motion for summary judgment was appropriate); *Ramirez v. DeCoster*, 194 F.R.D. 348, 355 (D. Me. 2000) (noting that consideration of summary judgment prior to class certification may be inappropriate if the case presents "a danger of a 'one way intervention,' i.e., allowing members of a Rule 23(b)(3) class the option of joining an action after a favorable judgment on the merits while avoiding any res judicata effects of an unfavorable ruling").

Additionally, the Court notes that unlike Defendants, Hartley should have little incentive to seek a ruling on the merits prior to class certification. Even if Hartley were to prevail on his motion for summary judgment, that determination would not be binding on class members. Therefore, obtaining a ruling on the merits of his claims prior to class certification would not promote efficiency or achieve Hartley's purported goal of securing victory for all class members. Moreover, the Court will decline to decide Hartley's motion for summary judgment because such a decision could result in the denial of his motion for class certification. *See Owens v. Hellmuth & Johnson PLLC*, 550

F. Supp. 2d 1060, 1070 (D. Minn. 2008) ("Plaintiffs have waived any right they may have had to prosecute this case as a class action by jumping directly to a final determination of the merits of their case when there was no obligation for them to do so."). Specifically, the Court might find Hartley to be an inadequate class representative if he prevailed on the present motion for summary judgment, as he would have little incentive to protect the class' interests if he had already obtained an individual judgment entitling him to the same statutory damages he could obtain in a class action. *See Sonmore v. CheckRite Recovery Servs., Inc.*, 206 F.R.D. 256, 263 (D. Minn. 2001) (querying "the sufficiency of Plaintiffs' incentives to adequately and vigorously represent the class" where plaintiffs had already succeeded on their summary judgment motion and thus were "in a position to immediately recover the very same amount of statutory damages that they may recover if they were to pursue the action as representatives of a class"). For these reasons, the Court will decline to consider Hartley's motion for summary judgment at this time.

### C.    Flat-Rating Under 15 U.S.C. § 1692j

The Court will now turn to Defendants' motion for summary judgment and begin with Hartley's claim for violation of 15 U.S.C. § 1692j. The FDCPA prohibits a practice known as "flat-rating," providing that:

> (a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

> (b) Any person who violates this section shall be liable to the same extent
> and in the same manner as a debt collector is liable under section 1692k of
> this title for failure to comply with a provision of this subchapter.

15 U.S.C. § 1692j.  Although the Eighth Circuit has not addressed liability for flat-rating,

other courts have held that "[t]his provision of the FDCPA typically addresses the use by

a creditor of a third party's letterhead in order to 'give the delinquency letters added

intimidation value, as it suggests that a collection agency or some other party is now on

the debtor's back.'"  *Passa v. City of Columbus*, 748 F. Supp. 2d 804, 813 (S.D. Ohio

2010) (alteration omitted) (quoting *Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725,

734-35 (7th Cir. 2004)) (internal quotation marks omitted); *see also* S. Rep. No. 95-382 at

5 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1699.

### 1.     Suburban's Liability for Flat-Rating

The Court must first determine whether Suburban, as a creditor,[4] may be liable for

flat-rating under § 1692j.  The FDCPA regulates the activities of, and imposes liability

upon, debt collectors, not creditors.  *See Heintz v. Jenkins*, 514 U.S. 291, 292-93 (1995);

*Schmitt v. FMA Alliance*, 398 F.3d 995, 998 (8th Cir. 2005). The FDCPA defines a debt

collector, in part, as "any person who uses any instrumentality of interstate commerce or

the mails in any business the principal purpose of which is the collection of any debts, or

who regularly collects or attempts to collect, directly or indirectly, debts owed or due or

---

[4] The FDCPA defines a creditor as "any person who offers or extends credit creating a
debt or to whom a debt is owed, but such term does not include any person to the extent he
receives an assignment or transfer of a debt in default solely for the purpose of facilitating
collection of such debt for another."  15 U.S.C. § 1692a(4).

asserted to be owed or due another." 15 U.S.C. § 1692a(6). Generally, this definition

does not include creditors. *See Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178,

183-84 (D.N.J. 2012); *see also* 15 U.S.C. § 1692a(6)(A) (expressly excluding from the

definition of debt collectors "officer[s] or employee[s] of a creditor while, in the name of

the creditor, collecting debts for such creditor"); *Catencamp v. Cendant Timeshare

Resort Grp.-Consumer Fin., Inc.*, 471 F.3d 780, 781 (7th Cir. 2006) (concluding that

creditors did not fall within an earlier, substantially similar, statutory definition of debt

collector). But the term "debt collector" does include  "any creditor who, in the process

of collecting his own debts, uses any name other than his own which would indicate that

a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6);

*see also James v. Ford Motor Credit Co.*, 842 F. Supp. 1202, 1207 (D. Minn. 1994).

Because "alleged debtors are more apt to pay attention to the demands of a party other

than the creditor," *White v. Goodman*, 41 F. Supp. 2d 794, 796 (N.D. Ill. 1998), Section

1692a(6) "closes a potential loophole that would otherwise allow creditors to improperly

suggest that an independent debt collector has entered the picture," *Larson v. Evanston

Nw. Healthcare Corp.*, No. 98 C 0005, 1999 WL 518901, at *2 (N.D. Ill. July 19, 1999).

One circumstance in which a creditor may be deemed a debt collector under the

latter part of § 1692a(6), and therefore fall within the FDCPA's scheme of liability, is

when the creditor engages in a flat-rating arrangement. *See Larson*, 1999 WL 518901 at

*3; *Sokolski v. Trans Union Corp.*, 53 F. Supp. 2d 307, 312 (E.D.N.Y. 1999).

> While 15 U.S.C. § 1692j is silent as to the creditor's liability under a flat
> rating arrangement – assigning liability only to the party **furnishing** the
> form – a creditor participating in the flat-rating arrangement can be liable

under the provision of the FDCPA prohibiting a creditor from using a name
to create the false impression that a third party is involved in the collection
of the creditor's debt.

*Sokolski*, 53 F. Supp. 2d at 312 (emphasis in original) (citing 15 U.S.C. § 1692a(6)).  In

other words, although Suburban cannot be liable as a flat-rater (because it did not

"furnish" prohibited forms to itself), if it is found to be a debt collector it **can** be liable

under the FDCPA for using a flat-rating scheme to create the impression that a third party

was involved in the collection of the debt.  *See* 15 U.S.C. § 1692e(14) (prohibiting a debt

collector from using "any false, deceptive, or misleading representation or means in

connection with the collection of any debt," including "[t]he use of any business,

company, or organization name other than the true name of the debt collector's business,

company, or organization"); *see also Catencamp*, 471 F.3d at 781-82.  Therefore, for

Suburban to be liable for engaging in the flat-rating arrangement alleged by Hartley, the

Court must determine whether Suburban is a "debt collector" within the meaning of the

Act.

Some courts have taken a narrow approach to creditor liability under the FDCPA,

finding creditors to be debt collectors under § 1692a(6) only where the creditor "actually

pretends to be someone else or uses a pseudonym or alias." *Villarreal v. Snow*, No. 95 C

2484, 1996 WL 473386, at *3 (N.D. Ill. Aug. 19, 1996).  These courts find that so long as

a creditor hires a debt collector to send out letters, the creditor cannot itself be deemed a

debt collector, no matter how minimal the role of the letter sender in the collection

scheme. *See Wegmans Food Mkts., Inc. v. Scrimpsher* (*In re Scrimpsher*), 17 B.R. 999,

1011 (Bankr. N.D.N.Y. 1982) (finding that as long as the agency hired by the creditor

qualifies as a debt collector under the Act by being in the business of collecting debts and participating in the collection process at least minimally, the creditor cannot be a debt collector and is shielded from liability under the FDCPA).

The Court finds the better-reasoned and more prevalent view is that liability can be imposed upon creditors not only where the creditor uses aliases or pseudonyms but also "where the creditor merely implies that a third party is collecting a debt when in fact it is the creditor that is attempting to do so." *Larson*, 1999 WL 518901 at \*3 (citing *Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 235 (2d Cir. 1998)).  The Court adopts this approach because it recognizes that an overly strict distinction between creditors and debt collectors undermines the remedial purposes of the Act, and elevates the form of a creditor's interaction with its debtors over its substance.  *See Fratto v. Citibank (S.D.), N.A.*, No. 94 C 1817, 1996 WL 554549, at \*5-6 (N.D. Ill. Sept. 25, 1996).

Under this approach, "[m]inimal participation by a debt collector in the collection process" is insufficient to prevent a creditor from being deemed a debt collector and therefore subject to liability under the FDCPA.  *Peters v. AT&T Corp.*, 43 F. Supp. 2d 926, 929 (N.D. Ill. 1999).  In determining whether a creditor is actually acting as a debt collector "courts have focused on whether the collection agency was hired only as a mailing service, or whether the collection agency performs more traditional collection services as well." *Id.*  Where a collection agency does little more than coordinate the mailing of letters and forward responses to the creditor, courts have determined that the creditor is in fact acting as the debt collector.  *See Sokolski*, 53 F. Supp. 2d at 313 ("Here,

the activities of Trans Union never went beyond coordinating the mailing of letters and forwarding responses to Bank One. This arrangement allowed Bank One to be involved in the collection of its own debts while also appearing to use the services of a collection agency. Under these circumstances, Bank One is properly held liable as a debt collector under 15 U.S.C. § 1962(a)(6).”); *Roe v. Publishers Clearing House, Inc.*, 39 F. Supp. 2d 1099, 1103-04 (N.D. Ill. 1999). Courts have examined an array of factors to ascertain whether a creditor that employs a collection agency is actually acting as a debt collector. Facts that weigh in favor of finding that a creditor is a debt collector include:

> (1) the collection agency is a mere mailing service or performs only ministerial functions; (2) the letters state if the debtor does not pay, the debt “will be referred for collection”; (3) the collection agency is paid merely for sending letters rather than on the percentage of debts collected; (4) the collection agency does not receive any payments or forwards payments to [the] creditor; (5) if the debtor fails to respond to the letter(s), the collection agency has no further contact with the debtor or the creditor decides whether to pursue collection; (6) the collection agency does not receive the files of the debtors; (7) the collection agency never discussed with the creditor the collection process or what steps should be taken with certain debtors; (8) the collection agency cannot initiate phone calls to debtors; (9) any correspondence received by the collection agency is forwarded to the creditor; (10) the collection agency has no authority to negotiate collection of debts; (11) the letters do not state the collection agency’s address or phone number; (12) the letter directs questions or payments to the creditor; and (13) the creditor has substantial control over the contents of the letters.

*Larson*, 1999 WL 518901 at *4 (collecting cases).

Examining these factors, the Court finds that the record does not support granting summary judgment in Defendants’ favor as to Suburban’s liability for flat-rating. Letter 3 gives the consumer the impression that Colltech is involved in the collection by using Colltech’s letterhead, stating that the communication is from a debt collector, and

noting that the collection agency is licensed with the Minnesota Department of Commerce.   Although Letter 3 creates the perception that Colltech is participating, the facts show that Colltech may have been acting as little more than a mail service for Suburban.   During Phase 1, for example, Suburban paid Colltech merely for sending letters, rather than a percentage of debts collected.   Colltech did not typically receive debtor's payments, and when it did, would immediately forward those payments to Suburban.   If a debtor failed to respond to Phase 1, Colltech would have no further contact with the debtor unless Suburban decided to pursue further collection.   Colltech did not receive the files of the debtors, and only had enough information to mail the Phase 1 letters.   Colltech could not initiate telephone calls, as it did not have the debtor's telephone numbers.   Correspondence received by Colltech from debtors was forwarded to Suburban.   Letter 3 did not include Colltech's telephone number and directed both questions and payments to Suburban.   Additionally, Colltech did not have the authority to negotiate debts on Suburban's behalf.   These facts indicate that Defendants are not entitled to summary judgment with respect to Suburban's liability for acting as a debt collector and participating in a flat-rating scheme.

## 2.    Colltech's Liability for Flat-Rating

Colltech can only be liable for acting as a flat-rater if it was not acting as a debt collector.   *See Anthes v. Transworld Sys., Inc.*, 765 F. Supp. 162, 167-68 (D. Del. 1991) ("[A] defendant can be either a 'debt collector' or a 'flat rater,' but not both.").   If the Court ultimately determines that Suburban was acting as a debt collector with respect to

Hartley's account, Colltech could face potential liability as a flat-rater. *See Baribeau v. Orthopedic Surgeons, Ltd.*, Civ. No. 4-95-671, 1997 U.S. Dist. LEXIS 23426, at *9-10 (D. Minn. Feb. 18, 1997) (explaining that "both creditor-defendants and the 'flat-rater' who furnishes the collection letters may be liable for violations of § 1692j"); *Scrimpsher*, 17 B.R. at 1011.

The analysis of whether a collection agency is acting as a flat-rater instead of as a true debt collector examines identical factors to those in the analysis described above for determining whether a creditor is acting as a debt collector. Essentially, to prove a violation of the FDCPA for flat-rating, a plaintiff must show that the collection agency was not acting as a debt collector, but was merely providing its name or letterhead for collection purposes. Therefore, in determining whether a collection agency is acting as a debt collector rather than a flat-rater, courts examine, among other factors, whether the agency collects money from debtors, whether debtors are directed to contact the agency, whether the agency provides follow-up collection services after letter mailing, and whether the agency receives a flat fee instead of a percentage of accounts paid pursuant to collection efforts. *See Randle v. GC Servs. L.P.*, 48 F. Supp. 2d 835, 840 (N.D. Ill. 1999); *see also Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1237-38 (5th Cir. 1997).

As explained above, examination of the collection efforts of Suburban and Colltech indicate that summary judgment in Defendants' favor as to Colltech's liability for flat-rating is inappropriate. It is undisputed that Colltech used its letterhead on the Phase 1 letters, which created the impression that a debt collection agency was now "on

- 26 -

[Hartley]'s back." *See Passa*, 748 F. Supp. 2d at 813 (internal quotation marks omitted).

Additionally, the undisputed facts do not demonstrate that Colltech was acting as a debt

collector, rather than merely providing that letterhead for Suburban's use.  For example,

Colltech did not typically collect money directly from debtors, debtors were directed by

the Phase 1 letters to contact Suburban, not Colltech, and Colltech received a flat fee for

the letters mailed during Phase 1 rather than a percentage of accounts paid.  Therefore,

the Court concludes that the undisputed facts do not demonstrate that Colltech was acting

as a debt collector rather than a flat-rater, and will deny Defendants' motion for summary

judgment with respect to Colltech's liability under § 1692j.[5]

### D.  Failure to Give Mandated Notices Under 15 U.S.C. § 1692g(a)

Hartley also brings a non-class claim, alleging that Defendants never provided him

with the notices required by the FDCPA.  Specifically, Hartley contends that Letter 3

failed to include language notifying him that if he disputed the alleged debt, the debt

collector would obtain verification of the debt.

The FDCPA provides that:

Within five days after the initial communication with a consumer in
connection with the collection of any debt, a debt collector shall, unless the

---

[5] The Court also notes that if Hartley prevails on his claim for flat-rating, and establishes
that Suburban was acting as a debt collector, it is likely that Suburban would also be liable for
using a "false, deceptive, or misleading representation or means in connection with the collection
of a[] debt," in violation of the FDCPA.  *See* 15 U.S.C. § 1692e.  Such a finding in addition to a
conclusion that Defendants were liable for a flat-rating scheme would, however, have little
practical impact because a single violation of the FDCPA is sufficient to expose a defendant to
liability for statutory damages.  *See Picht v. Hawks*, 77 F. Supp. 2d 1041, 1043 (D. Minn. 1999).

following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing--

(1)  the amount of the debt;

(2)  the name of the creditor to whom the debt is owed;

(3)  a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4)  a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5)  a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a).[6]

The parties agree that Letter 3 did not include language giving Hartley all of the notices mandated by § 1692g(a).  Defendants therefore concede that if Letter 3 was the only letter sent to Hartley, they are liable for a violation of the FDCPA.  The parties also agree, however, that Letter 1, allegedly sent to Hartley on December 30, contains the statutorily required notices.  Consequently, for purposes of the present motion, the dispute revolves around whether Letter 1 was sent to Hartley.

---

[6] As previously explained, the FDCPA imposes liability only upon debt collectors, and § 1692g(a) clearly states that a debt collector shall provide the statutorily required notices.  The statutory provision can only apply to one of the Defendants in the present case, that is, whichever Defendant is determined to be a debt collector pursuant to the analysis outlined above. Therefore, either Suburban or Colltech – but not both – could ultimately be liable for violation of § 1692g(a).

"Under the FDCPA a debt collector must **send** a written notice to an alleged debtor containing, among other things, the amount of the debt and statements that the consumer may dispute the debt in writing and may request written verification." *Antoine v. J.P. Morgan Chase Bank*, 757 F. Supp. 2d 19, 22 (D.D.C. 2010) (emphasis in original) (citing 15 U.S.C. § 1692g).   "Section 1692g does not require that this information be **received** by the debtor, however.   Instead, it explicitly states that a notice must be sent." *Id.* at 22-23 (emphasis in original); *see also Mahon v. Credit Bureau of Placer Cnty., Inc.*, 171 F.3d 1197, 1201-02 (9th Cir. 1999) (holding that the FDCPA requires only that a debt collector send the necessary notice).   Therefore, to prevail on summary judgment, Defendants must demonstrate that no reasonable factfinder could determine that Colltech failed to send Letter 1 to Hartley.

The undisputed evidence in the record shows that Colltech prepared Letter 1 on December 29, 2010, and delivered the letter to Apex for printing.   Apex received the letter the same day.   Apex's records reflect that on the next day, Letter 1, which was addressed to Hartley, was printed, inserted into an envelope, and delivered for mailing. Pursuant to Apex's regular business practices, Letter 1 would have been delivered to Apex's presort house for input into the United States Postal Service mail stream. Additionally, Letter 1's input into the United States Postal Service mail stream would have been electronically documented, with verification sent to Colltech that the letter had been delivered for mailing.   Hartley's only response to this evidence is that Becker's affidavit is insufficient to support summary judgment because it does not state "to whom"

the letter was delivered.[7]   Hartley's contention is without merit, because Becker's affidavit clearly specifies the business procedures used to deliver the letters to a presort house for input into the United States Postal Service mail stream.   The undisputed evidence that Apex followed its standard business procedures for mailing Letter 1 is sufficient to show that Letter 1 was sent to Hartley, which is all Defendants must show in order to prevail on Hartley's claim for violation of § 1692g(a).   *See Mahon*, 171 F.3d at 1202 (affirming grant of summary judgment in the debt collector's favor where plaintiffs "offered no evidence that the Credit Bureau failed to follow its ordinary business procedure in sending them the Notice.   They simply say they did not receive the Notice . . . ."); *Van Westrienen v. Americontinental Collection Corp.*, 94 F. Supp. 2d 1087, 1097-

---

[7] Hartley also makes a passing reference to his possible entitlement to a continuance under Federal Rule of Civil Procedure 56(d).  Hartley argues that Defendants did not list Apex or its employees as persons likely to be used in support of their defenses.  Therefore, Hartley argues he has not had the opportunity to depose Apex's representative, and should be allowed that opportunity before summary judgment is granted.  Defendants supplemented their discovery answers on December 14, 2012, to reflect Apex's inclusion as an entity used to support the defense.  (Aff. of Matthew Doherty ¶ 2, Ex. A, Jan. 21, 2013, Docket No. 51.)  Defendants disclosed Apex after Costello's deposition in which Hartley's counsel focused on the mailing mechanisms used by Colltech.  (*Id.*, Ex. A.)  Because Defendants appear to have promptly disclosed their reliance on Apex, and discovery did not close until April 1, 2013, (*see* Pretrial Scheduling Order, Apr. 2, 2012, Docket No. 12), there appears to be no legitimate justification for continuing the summary judgment motion.

Furthermore, Hartley did not make any attempt to comply with the requirement of Rule 56(d).  Under Rule 56(d) a "party opposing summary judgment is required to file an affidavit [or declaration] showing what specific facts further discovery might uncover."  *Roark v. City of Hazen*, 189 F.3d 758, 762 (8th Cir. 1999).  And it is not enough for a party seeking a continuance to merely list facts that might be unearthed in further discovery.  *Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir. 2010).  Rather, the nonmovant must "articulate how those facts [are] relevant 'to rebut the movant's showing of the absence of a genuine issue of fact.'"  *Id.* (quoting *Humphreys v. Roche Biomedical Lab., Inc.*, 990 F.2d 1078, 1081 (8th Cir. 1993)).  Therefore, to the extent Hartley's briefing can be read as requesting a continuance under Rule 56(d) the Court denies the request.

98 (D. Or. 2000) (granting summary judgment in debt collector's favor where it produced undisputed evidence that it had followed "its own ordinary business procedures" in sending out the required notice). Therefore, the Court will grant Defendants' motion for summary judgment with respect to Hartley's claim for failure to provide required notices under the FDCPA.

### E.  False Credit Reporting Under 15 U.S.C. § 1692e

Hartley also claims that Letter 3 violated 15 U.S.C. § 1692e by stating that Hartley's failure to pay the balance due on his account could result in damage to his credit score. The FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Under this provision, a debt collector is prohibited from "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8).

As a preliminary matter, Hartley did not respond to Defendants' motion for summary judgment on this claim, and therefore has likely waived the claim. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments.").

Even if Hartley had not waived the claim, however, the Court finds that the credit reporting language of Letter 3 did not violate the FDCPA.  The Act prohibits threatening to communicate credit information which is known, or should be known to be false. 15 U.S.C. § 1692e(8).   Here, Letter 3 states that "[t]he alternatives available to [Suburban] should you not clear this obligation may include damage to your credit rating or further collection activity."  Nothing in this phrase indicates an intent to communicate credit information that is false.  Failure to respond to Letter 3 can result in Suburban placing an account in Phase 2.  During Phase 2, Colltech may credit report any debts over $10, including Hartley's overdue account.  Therefore, the letter is an accurate statement of the possible outcomes of failing to respond to Letter 3.  Because no genuine issues of material fact remain with respect to whether Letter 3 threatens to communicate credit information that is false, the Court will grant Defendants' motion for summary judgment.

## II.     CLASS CERTIFICATION

Hartley seeks class certification under Fed. R. Civ. P. 23(b)(3).  Hartley clarified at oral argument that the class he seeks to certify includes all consumers in Minnesota who received any of the three Phase 1 letters, bearing the letterhead of "CT Inc. Services" in the one year prior to the filing of the instant action.

### A.     Rule 23(a) Prerequisites

The Rule 23(a) requirements for class certification are: (1) the putative class is so numerous that it makes joinder of all members impractical; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of

the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005) (citing Fed. R. Civ. P. 23(a)). District courts have "broad discretion" under this rule to determine whether class certification is appropriate. *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 436 (8th Cir. 1999).

### 1. Numerosity

With respect to numerosity, although exact numbers have not been determined, there appears to be somewhere in the range of 10,000 to 20,000 class plaintiffs. One year prior to the filing of the present complaint, Colltech received 23,213 accounts from Suburban for Phase 1 treatment. (Costello Dep., Ex. 12.) The exact number of class members will be 23,213 minus accounts for debts incurred by non-Minnesota residents. Additionally, the number of class members will be reduced to the extent that single individuals have more than one account with Suburban. Defendants do not dispute that Hartley has satisfied the numerosity requirement, and the Court agrees that joinder of this number of consumers would be impracticable. *See Sonmore v. CheckRite Recovery Servs., Inc.*, 206 F.R.D. 257, 261 (D. Minn. 2001) (finding the numerosity requirement satisfied where defendants sent "approximately 40,000 debt collection letters to approximately 20,000 persons").

### 2.    Commonality and Typicality

Rule 23(a)(2) requires that "'there are questions of law or fact common to the class.'" *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2548 (2011) (quoting Fed. R. Civ. P. 23(a)(2)).  "As a general rule, the commonality requirement imposes a very light burden on a plaintiff seeking to certify a class and is easily satisfied." *Sonmore*, 206 F.R.D. at 261 (alteration and internal quotation marks omitted). Commonality "may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982) (internal quotation marks omitted).  Typicality requires "that there are other members of the class who have the same or similar grievances as the plaintiff." *Sonmore*, 206 F.R.D. at 262 (internal quotation marks omitted).  Commonality and typicality tend to be analyzed together because both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551 n.5 (internal quotation marks omitted).

Defendants do not dispute that the requirements of commonality and typicality have been met.  The questions of law and fact implicated by this action all arise out of Phase 1 form letters, and therefore would be identical among class members.  All class members claims "would share the legal question of whether the language in the form letter violates [§ 1692j] of the FDCPA."  *Bryant v. Bonded Account Serv./Check*

*Recovery, Inc.*, 208 F.R.D. 251, 259 (D. Minn. 2000); *see also Jones v. CBE Grp., Inc.*, 215 F.R.D. 558, 568 (D. Minn. 2003) (finding commonality satisfied because "[i]f the letter violates the FDCPA as to any class member, it violates the Act as to all class members").  Hartley also satisfies the typicality requirement because he received a form letter containing identical letterhead and contact information as the other class members. *See Jones*, 215 F.R.D. at 568 ("Because the letter received by the plaintiff was identical in all material respects to those received by other class members, the court finds the claims of the named plaintiff sufficiently typical of those of the putative class and the typicality requirement of Fed. R. Civ. P. 23(a)(3) is met."); *Bryant*, 208 F.R.D. at 259 ("Typicality is inherent in Bryant's class in that each class member was subjected to the same alleged FDCPA violation when they were sent the dunning letter." (alterations and internal quotation marks omitted).

### 3.     Adequacy of Representation

Finally, "[t]o ensure that the interests of unnamed class members are fairly and adequately protected, Rule 23(a)(4) requires a finding that named plaintiffs and counsel will competently and vigorously pursue the action on behalf of all class members." *Jones*, 215 F.R.D. at 568.  When determining whether representation will be adequate, the Court is tasked with ascertaining whether "(1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562-63.

Defendants do not dispute that Hartley would adequately represent the class. As explained above, Hartley's claims are identical to those of other class members and he has a common interest in recovering statutory damages for Defendants' alleged violations of the FDCPA. *See Mund v. EMCC, Inc.*, 259 F.R.D. 180, 185 (D. Minn. 2009) (finding a plaintiff with claims for statutory damages to be an adequate representative for a class action brought under the FDCPA). Furthermore, the Court has no reason to believe that Hartley's counsel would not adequately protect the interests of the class. Hartley's counsel has previously been found to be adequate class counsel in similar FDCPA class actions. *See, e.g.*, *Drinkman v. Encore Receivable Mgmt., Inc.*, No. 07-C-363, 2007 WL 5404595, at *4 (W.D. Wis. Dec. 3, 2007); *Jancik v. Cavalry Portfolio Servs., LLC*, 2007 WL 1994026, at *7-8 (D. Minn. July 3, 2007). Therefore, the Court finds that Hartley has satisfied the prerequisites for class certification.

## B.      Rule 23(b)(3) Certification

In addition to satisfying the prerequisites of Rule 23(a), a class may be maintained under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A party proposing to be a class representative bears the burden of showing that a class action is appropriate, and that the requirements of Rule 23 are met. *Coleman v. Watt*, 40 F.3d 255, 258-59 (8th Cir. 1994).

### 1.    Predominance

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).   This requirement is satisfied "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *Sonmore*, 206 F.R.D. at 264 (internal quotation marks omitted).   The Court finds, and the parties do not dispute, that predominance is satisfied by Hartley's proposed class action.   Hartley has identified a series of form letters that raise a common legal question under the FDCPA. Even if individual class members should claim actual damages arising out of Defendants' alleged flat-rating scheme, such damage determinations would not predominate over the liability questions in the litigation, nor would they "otherwise outweigh the value that class members will derive from a common adjudication of the underlying [legal] issue." *Mund*, 259 F.R.D. at 186.   Therefore, the Court finds that the predominance requirement is satisfied.

### 2.    Superiority

In determining whether a class action is superior to other available methods, courts consider (1) the class members' interests in individually controlling the litigation; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P.

23(b)(3)(A)-(D).   A class action is a superior form of litigation if it is capable of addressing "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods.*, 521 U.S. at 617 (internal quotation marks omitted).

The parties' primary dispute regarding the superiority of a class action revolves around the amount of damages that would be recoverable by class members.   In an individual FDCPA case, the Court has the discretion to award a successful plaintiff up to $1,000 in statutory damages.   15 U.S.C. § 1692k(a)(2)(A).   With respect to class actions, however, the FDCPA provides that the total recovery for unnamed class members shall "not exceed the lesser of $500,000 or 1 per centum of net worth of the debt collector."   15 U.S.C. § 1692k(a)(2)(B).   A court's class award is to be made "without regard to a minimum individual recovery." *Id.*

Defendants argue that the provision of the FDCPA limiting class recovery to $500,000 or 1 per centum of net worth of the debt collector in this case will render a class action an inferior means of adjudication.   Specifically, the CEO of Suburban filed an affidavit that Suburban's approximate net worth was $139,220.19 on March 31, 2012. (Costello Dep., Ex. 8 ¶¶ 1-2.)   Costello testified that Colltech has total equity of $145,250.68.   (Costello Dep., Ex. 11.)   Defendants contend that this small net worth, combined with a class of potentially 22,000 plaintiffs, makes a class action an inappropriate tool because each plaintiff's recovery would only be on the order of $0.13 (one percent of Defendants' combined net worth divided by 22,000 plaintiffs).   If each plaintiff brought an action individually, however, he could stand to recover $1,000 in

statutory damages as well as attorneys' fees and costs. *See Bryant*, 208 F.R.D. at 261 n.10.

As an initial matter, Hartley contends that he "is skeptical of" the net worth figures provided by Defendants, "and plans to take further discovery on net worth if the Class is certified." (Pl.'s Mem. in Supp. of Mot. for Class Cert. at 6.)  In particular, Hartley notes that Suburban's employee in charge of collections testified that $139,220,19 seemed low to her.  (Fredin Dep. 64:21-65:4.)   Additionally Hartley notes that Suburban did not produce a representative to testify regarding net worth even though Hartley noticed Suburban's deposition as to net worth.  (*Id.* 52:18-53:2.)   As for Colltech, Hartley disputes that all of the liabilities claimed in Colltech's balance sheet are actually business liabilities.   Furthermore, Hartley believes Colltech's net worth calculation is incorrect because no Colltech witness testified as to the company's finances generally or the preparation of the balance sheet.   Despite Hartley's general objections to the veracity of Defendants' stated net worth, the Court is still equipped to decide the issue of class certification.  Notably, issues of net worth aside, the FDCPA caps damages for the class recovery at $500,000 which in this case would yield a damages award of approximately $22.73.[8]   Therefore, even if Colltech's net worth is vastly understated, the Court is still confronted with the fundamental question of whether a relatively small class recovery,

---

[8] It is possible that the final number of class members will be less than 22,000.  Even a substantial reduction in the number of class members is unlikely, however, to increase the amount of damages recoverable by unnamed class members to an amount close to the $1,000 recoverable by individuals.

especially in comparison with the potential recovery should each class member bring his or her own action, renders class certification inappropriate.

Some courts have determined that "[t]he maximum potential award of statutory damages if [an FDCPA] action were maintained as a class action is clearly relevant to 'the interest of members of the class in individually controlling the prosecution or defense of separate actions.'" *Bryant*, 208 F.R.D. at 260 (quoting Fed. R. Civ. P. 23(b)(3)(A)) (denying a motion to certify a class where plaintiff had failed to demonstrate the defendants' net worth, and therefore had failed to prove that class action was a superior mechanism where purported class members would not recover more than the $1,000 of statutory damages available if each member sued individually). Courts examining the maximum potential award under FDCPA cases have almost uniformly denied class certification where class recovery would have been substantially less than the amount individuals could recover if they brought their own action. *See Jones*, 215 F.R.D. at 570 (declining to certify class action under FDCPA where potential recovery was de minimis); *Sonmore*, 206 F.R.D. at 265 (denying class certification where "each absent class member stands to recover a maximum of twenty-five dollars" finding such an award "shockingly low when compared to the statutory damages of up to $1,000 that each class member may be eligible to receive in an individual suit").

Other courts, however, have reasoned that the potential maximum recovery is not the only, or most relevant, consideration when determining whether an FDCPA class action may be certified, and have certified classes even where the potential recovery for each class member is small. *See Jancik*, 2007 WL 1994026 at *11 (certifying a class

where potential recovery for class members was only $6.94); *Nichols v. Northland Grps., Inc.*, Nos. 05 C 2701, 05 C 5523, 06 C 43, 2006 WL 897867, at *11 (N.D. Ill. Mar. 31, 2006) (certifying a class with potential recovery of only $13.40 per class member).   In *Jancik*, the court found that the small amount of recovery was not a bar to class certification, because although each plaintiff could potentially recover full statutory damages, "the truth is that the putative plaintiffs in this case are not likely to know their rights and are therefore not likely to pursue these claims on their own." *Jancik*, 2007 WL 1994026 at *11.   Because no other plaintiff had brought a lawsuit regarding the FDCPA violations at issue, declining to certify a class would only have benefitted the defendant. *Id.*  The court concluded that "Defendant should not be allowed to avoid paying damages simply because each individual plaintiff will receive only a small recovery.   Doing so would create an illogical situation in which a defendant that harmed many people could avoid class liability while a defendant that harmed fewer people could not avoid liability." *Id.*; *see also Weber v. Goodman*, 9 F. Supp. 2d 163, 171 (E.D.N.Y. 1998) (certifying a class where recovery for individual class members would be less than $2, noting that it was illogical that defendants would be subject to a class action lawsuit if they "had sent fewer allegedly unlawful letters").

The Court agrees with the reasoning of the court in *Jancik*, and finds that the small amount of recovery is not a bar to class certification in this case.   While individual plaintiffs could potentially obtain a greater amount of damages in an individual suit, the Court is unaware of any other Suburban clients that have sued over these possible FDCPA violations.   Because all class plaintiffs are unlikely to bring their own claims for

FDCPA violations, the Court finds that a class action in this case is best suited to address "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods.*, 521 U.S. at 617; *see also Egge v. Healthspan Servs. Co.*, 208 F.R.D. 265, 272 (D. Minn. 2002) ("The small average individual losses in this case make individual lawsuits highly unlikely, making the class action the superior method for adjudication of the claims against [defendant]. The objectives of the FDCPA, and the goals of Rule 23, are served by class certification in this case."). Individuals desiring to pursue their own claims for statutory damages are, of course, entitled to opt out of the class action. *See Egge*, 208 F.R.D. at 272 ("[Defendant's] alleged concern that individual class members may be able to recover more in individual actions is adequately addressed by use of the Rule 23(b)(3) opt-out procedure." (internal quotation marks omitted)). Furthermore, declining to certify a class, in this case, would only serve to benefit Defendants, rewarding them for sending large quantities of potentially illegal form letters by requiring them to pay statutory damages to only the single named plaintiff. Finally, the Court finds that certifying this class, even where individual recovery may be small, is consistent with the FDCPA scheme for awarding class action damages "without regard to a minimum individual recovery." 15 U.S.C. § 1692k(2)(B). Because Hartley has satisfied the requirements for class certification under Rule 23(b)(3), the Court will grant his motion for class certification.

# ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**

1.    Defendants' Motion for Summary Judgment [Docket No. 38] is **GRANTED in part** and **DENIED in part** as follows:

      a.    Defendants' motion is **DENIED** with respect to Plaintiff's claim for violation of 15 U.S.C. § 1692j.

      b.    Defendants' motion is **GRANTED** with respect to Plaintiff's claims for failure to provide mandated notices pursuant to 15 U.S.C. § 1692g(a) and communication of false credit reporting information pursuant to 15 U.S.C. § 1692e(8).  Plaintiff's claims arising out of § 1692g(a) and § 1692e(8) are hereby **DISMISSED WITH PREJUDICE**.

2.    Plaintiff's Motion for Partial Summary Judgment [Docket No. 33] is **DENIED without prejudice** as premature.  Plaintiff may refile its motion for Partial Summary Judgment within thirty (30) days, after the time period for a putative class member to opt out of the class action has expired.

3.    Plaintiff's Motion for Class Certification [Docket No. 29] is **GRANTED** as set forth in the body of this Order.


DATED:  September 30, 2013
at Minneapolis, Minnesota.

                    s/ John R. Tunheim
                    JOHN R. TUNHEIM
              United States District Judge